SBK:LMN
F.#2008R00069

MOC-0045

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

JEFFREY LUNA and
CHRISTOPHER BELTRE,

Defendants.

- - - - - - - - - - - - - - - - -X

TO BE FILED UNDER SEAL

AFFIDAVIT IN SUPPORT OF
ARREST WARRANTS

18 U.S.C. § 1951(a)

EASTERN DISTRICT OF NEW YORK, SS:

RICHARD KERSHOW, a Detective with the Nassau County Police Department ("NCPD") and cross-designated as a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such, deposes and says as follows:

In or about July 2006, within the Eastern District of New York, the defendants JEFFREY LUNA and CHRISTOPHER BELTRE, did knowingly and intentionally conspire to obstruct, delay and affect commerce, and the movement of any article in commerce, by robbery.

(Title 18, United States Code, Section 1951(a)).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I have been a police officer with the NCPD since 1993, and a Detective with the NCPD for five of those years. I

---

[1] Because the purpose of this Affidavit is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

2

am also cross-designated as a TFO with the DEA. During my tenure with the NCPD, I have investigated various federal and state criminal violations including robberies, narcotics trafficking, and homicides. During the course of those investigations, I have conducted physical surveillance, monitored undercover operations, debriefed cooperating witnesses and confidential informants, monitored wiretaps and cloned pagers, and interviewed civilian witnesses.

2. The information contained in this affidavit is based upon my personal involvement in the investigation, interviews with witnesses, a review of documents and records, and conversations with fellow law enforcement agents.

3. On or about June 26, 2006, as part of an ongoing narcotics investigation, agents from the DEA received court authorization to intercept wire communications over telephone number 347-880-7880 (the "7880 Phone"), a cellular telephone utilized by a co-conspirator ("Co-Conspirator #1"). A few days later, on or about July 3, 2006, two individuals were in contact with Co-Conspirator #1 over the 7880 Phone – "Luna," later identified as defendant JEFFREY LUNA, and "Chris," later identified as defendant CHRISTOPHER BELTRE.

4. Over the intercepts on July 3, 2006, LUNA, BELTRE, Co-Conspirator #1 and Co-Conspirator #2 discussed a home invasion robbery in progress that they were perpetrating. Based upon these intercepts and the subsequent investigation, agents learned that at least four conspirators performed counter-surveillance in

3

and around the apartment building prior to the robbery, two conspirators entered the apartment to commit the robbery while the other two acted as lookouts, and that a victim inside the apartment was pistol whipped with a firearm and robbed of money by the conspirators.

5. Specifically, at approximately 10:28 a.m., LUNA asked Co-Conspirator #1 over the 7880 Phone, "Yo what's up? What's going on?"[2] Co-Conspirator #1 responded, "Let's roll, what's the deal?" At approximately 10:49 a.m., LUNA informed Co-Conspirator #1 that he was parked across the street from the apartment building. Based on my training and experience and the investigation thus far, I believe that LUNA and Co-Conspirator #1 were confirming with each other that they were ready to perform the robbery that day.

6. At approximately 10:51 a.m., Co-Conspirator #1 told Co-Conspirator #2 over the 7880 Phone to call him, or "[h]it me," after Co-Conspirator #2 entered the building. Co-Conspirator #1 instructed Co-Conspirator #2 to go inside the apartment with a gun, or "jammie," and to threaten the occupants, or "hammer it up inside." Co-Conspirator #1 instructed Co-Conspirator #2 to be careful, and not to "play games" once he got inside because the superintendent was nearby. A few minutes later, at approximately, 10:58 a.m., Co-Conspirator #2 told Co-Conspirator #1 that they needed to be careful to make sure that no victims screamed during

---

[2] All conversations are described in substance and in part, and are not intended to be set forth verbatim.

4

the robbery, "Yo, when the door opens that one little scream, ahhh. And they shut up, that's one scream too many." Co-Conspirator #1 replied that Co-Conspirator #2 should subdue the victims by displaying his/her gun, "So if I was you, I would do it straight up. Like just pull out the pim, boom, and be like, yo, boom, boom, then just go in when see the door nice and open and tell them this is a set up, don't move."

7. A few minutes later, at approximately 11:03 a.m., Co-Conspirator #1 and LUNA discussed over the 7880 Phone having LUNA enter the apartment to help Co-Conspirator #2 with the robbery. Specifically, Co-Conspirator #1 told LUNA, "It's about to go down. So walk over just in case we need you to walk in and it's a new face." At approximately 11:06 a.m., LUNA told Co-Conspirator #1 that he was outside of the building, and asked what he should do next. Co-Conspirator #1 informed him that he should "chill" and make sure he continued to be accessible by phone. Based on my training and experience and the investigation thus far, I believe that Co-Conspirator #1 instructed LUNA to be prepared to go into the apartment to do the robbery. I believe that after LUNA walked to the entrance of the apartment building, he was instructed by Co-Conspirator #1 to be available by phone.

8. At approximately 11:10 a.m., Co-Conspirator #1 informed BELTRE over the 7880 Phone not to leave any fingerprints behind as he (BELTRE) was trying to get into the apartment building, "Try not to put your fingerprints, use your knuckles and touch the five, fifth floor button. What I'm trying to say

is use your knuckles and shit and push the door with your elbows." BELTRE responded, "Alright." At approximately 11:23 a.m, BELTRE informed Co-Conspirator #1 that although he was ringing the buzzers at the front door to the apartment building, no resident was answering. "No one wants to open the door. I pressing a lot of buttons." Co-Conspirator #1 responded that in order to get inside the building, they would follow behind someone else entering the building, "Alright, yo come back, stay there, stay there, stay there, stay there, for a second, stay there for a second. When they go in, we coming in, then you come." BELTRE replied, "Alright." Based on my training and experience and the investigation thus far, I believe that BELTRE was attempting to get inside the apartment building by buzzing multiple residents, but no resident was responding. I believe that BELTRE and Co-Conspirator #1 agreed to enter the apartment building by following behind an unsuspecting resident entering the building.

9. At approximately 11:31 a.m., Co-Conspirator #2 told Co-Conspirator #1 over the 7880 Phone that they had entered the apartment they intended to rob, but that the victim was telling them that there was no money in the apartment, "Yo we're inside, but he's talking about there ain't nothing in here. You heard?". Co-Conspirator #2 further told Co-Conspirator #1 that he had injured the victim, "Shit I got him bleeding." At approximately 11:36 a.m., Co-Conspirator #1 told Co-Conspirator #2 to "Make sure he's [the victim's] tied up." At approximately 11:38 a.m.,

Co-Conspirator #1 directed Co-Conspirator #2 to make sure that they take all the money, or "paper," in the apartment.

10. At approximately 12:09 a.m., LUNA asked Co-Conspirator #1 over the 7880 Phone in a rushed voice to meet him in front of the building, "Meet us out in the front, alright? I mean, like, right away." Co-Conspirator #1 replied that he would. A few minutes later, LUNA asked Co-Conspirator #1 over the phone to pop the trunk of the car, and Co-Conspirator #1 assented that he would. Based on my training and experience and the investigation thus far, I believe that LUNA was inside the apartment, had finished committing the robbery with Co-Conspirator #2, and was notifying Co-Conspirator #1 to bring around a car to meet them in a car as the two were leaving the building. I believe that LUNA asked Co-Conspirator #1 to pop the trunk so as to place inside the items they had stolen from the apartment.

11. Cell site information obtained that day on the 7880 Phone revealed that while the above-described intercepts took place, the 7880 Phone was using a cell tower located in the vicinity of Flushing, New York. After speaking with various New York City Police Department ("NYPD") precincts in and around Flushing that afternoon, agents learned that a home invasion robbery had been reported earlier that day at an apartment in Flushing, namely 142-30 Sanford Avenue, Apt. 1F, Queens, New York (the "Sanford Apartment"), and that this robbery had occurred at or around the same time as the above-described intercepts. No

other robbery reported in the Flushing area matched the date and time as that discussed over the wire intercepts. The robbery was reported to the NYPD by a witness who had heard a disturbance in the apartment building and then contacted authorities.

12. The victim of the robbery was interviewed by NYPD officers, and reported that he was inside the Sanford Apartment earlier that day with his child when he answered the door to let in two men who identified themselves as DHL delivery drivers. After he opened the door, the "DHL drivers" assaulted him by pistol whipping him on the head with a firearm. Moreover, the "DHL drivers" tied his hands and then put a covering over his head. The victim reported that they demanded money from him and then ransacked the apartment.

13. A few days after the robbery, on or about July 12, 2006, at approximately 1:35 p.m., BELTRE called the 7880 Phone and spoke with a woman, later identified as the wife of Co-Conspirator #1. During the call, BELTRE told the woman that he needed to come over to her apartment (shared with Co-Conspirator #1) because he "has to get something out of there." The woman responded, "Do you know where it is?" And BELTRE responded, "Yeah." BELTRE proceeded to explain how "they" had placed "something" in the apartment, and that they had placed it in basement for safekeeping. The two then made arrangements for BELTRE to come over to the apartment later in the evening to retrieve the item. Based on my training and experience and the

investigation thus far, I believe that BELTRE was discussing a firearm that he had placed in the basement.

14. Agents established surveillance later that evening in the vicinity of the home of Co-Conspirator #1 located in West Babylon, New York. Agents observed BELTRE arrive at the home of Co-Conspirator #1 in a Honda RGL around 9:45 p.m, and get out of the passenger side of the car. Agents observed BELTRE enter the rear yard of the residence, meet with the woman, and then leave the residence approximately five minutes later. Agents continued surveillance on BELTRE as he proceeded to drive around in the Honda for approximately two hours. During this time period, the Honda was observed meeting numerous times with a Chrysler Pacifica in various locations in Linderhurst, New York. These meetings occurred on side streets, where the Honda and Pacifica generally parked side by side.

15. Ultimately later that evening state police officers performed a traffic stop of both the Honda in which BELTRE was riding as well as the Pacifica. Two marked police cars attempted to pull over the Pacifica. However, the Pacifica stopped in the middle of the road, and the three occupants of the car left the vehicle and attempted to run on foot. The three occupants were subsequently arrested in the immediate proximity of the vehicle. Police recovered a loaded handgun in plain view from within the Pacifica. Moreover, a small quantity of heroin, crack cocaine, and cocaine, as well as glassine envelopes were recovered from within the Pacifica. Based on my training and

experience and the investigation thus far, I believe that BELTRE retrieved this loaded handgun from the wife of Co-Conspirator #1 earlier that evening, and during one of the meetings he had with the Pacifica, passed the loaded handgun to the occupants of the Pacifica.

16. The traffic stop of the Honda in which BELTRE was riding occurred on the Southern State Parkway by other police units. BELTRE was brought back to a local precinct. A fingerprint check of BELTRE revealed his true identity and that he was wanted on a warrant out of New York State for violating the conditions of his probation on a prior narcotics charge.

17. Moreover, based upon numerous phone calls between LUNA and Co-Conspirator #1 over the 7880 Phone both prior to and after the robbery, agents were able to identify defendant JEFFREY LUNA as the "Luna" referenced over the intercepts.

18. Based on my training and experience, I am aware of the existence of robbery crews which steal narcotics and/or narcotics proceeds and which use firearms to carry out their robberies.

WHEREFORE, your deponent requests that the defendants JEFFREY LUNA and CHRISTOPHER BELTRE be dealt with according to law.

```
                                    _____
                                    RICHARD KERSHOW
                                    Task Force Officer/Detective
                                    Drug Enforcement Administration
```

Sworn to before me this
\_\_16\_\_ day of January, 2008

```
_____              _____
THE                  JR.
Unit                 Judge
East                 York
```